295 So.2d 219 (1974)
Charles Ray GREIN, d/b/a Grein Sanitary Operating Account, Plaintiff-Appellee,
v.
James HAWKINS, Defendant-Appellant.
No. 4560.
Court of Appeal of Louisiana, Third Circuit.
May 24, 1974.
*220 Leonard K. Knapp, Jr., Lake Charles, for defendant-appellant.
Charles S. King, Lake Charles, for plaintiff-appellee.
Before CULPEPPER, MILLER and WATSON, JJ.
MILLER, Judge.
Defendant Mr. James Hawkins appeals the trial court judgment which awarded $337.22 due on open account to plaintiff Mr. Charles Ray Grein, d/b/a Grein Sanitary Operating Account (GSOA). That amount was owed for sewage services and penalty fees. Hawkins' reconventional demand under the federal Consumer Credit Protection Act was denied. We affirm.
GSOA, a private concern, is operating the sewage facilities for Greinwich Terrace Subdivision in Lake Charles. When these sewage facilities were constructed, the subdivision was outside the Lake Charles city limits. The subdivision was annexed prior to the instant litigation.
On August 25, 1955, the Greinwich Terrace Sanitary Corporation was created to provide sewage disposal facilities in Greinwich Terrace Subdivision. Every homeowner was to purchase one share of common stock upon payment of $1.00 per share. Two thousand shares were authorized. Ownership of shares was restricted to owners of residences in Greinwich Terrace. The charter provided that the sale of a residence in the subdivision shall carry with it the sale of that share of stock pertaining to the residence. The charter was recorded in the Book of Charters, Calcasieu Parish. There is no evidence to show that Hawkins' predecessor in title became a shareholder. Hawkins does not allege that he is a shareholder, and no evidence appears of record to indicate his status as such, other than the inference drawn from the charter.
The Board of Directors was authorized to levy assessments. The charter provided that until new rates or assessments were established by the board or the share-holders, each residence would be assessed $3.00 per month for sewage disposal facilities. There is no evidence indicating a change in the rate structure by the board or shareholders.
On August 26, 1955, Coastal Development Company, appearing through plaintiff Grein as president, donated by authentic act to the corporation a parcel of land in the subdivision containing a sewage plant and other improvements. The validity of the donation has not been attacked. On the same day, the corporation and Southern Construction Company, appearing through George L. Grein, its president, entered an operating contract. This contract provided that Southern would undertake full operational duties of the sewage facilities in the subdivision. In return, Southern was to receive $3.00 monthly from each house connected to the system. Southern was also granted full power and authority to enforce the collection of fees from owners of properties serviced by the sewage facilities.
On January 21, 1960 Southern Construction assigned its contractual rights and obligations under the operating contract with the corporation to plaintiff Grein, for a stated consideration of $100.00.
In 1960, the Louisiana Legislature provided the Louisiana Public Service Commission with authority to regulate all privately owned and operated sewage disposal companies, including the authority to regulate rates. LSA-R.S. 45:1203.
*221 By Order number 10,130 dated October 29, 1968, the Louisiana Public Service Commission granted the Greinwich Terrace Sanitary Corporation a 60% rate increase. By letter to the Commission dated November 13, 1968, the corporation acknowledged receipt of the order, and listed a rate schedule in compliance with the order. The rate for residential customers was listed as $4.80 per month. The letter was signed by plaintiff Grein, as president of Greinwich Terrace Sanitary Corporation. The only other pertinent order in the record is a General Order dated November 16, 1972, ordering a decrease in penalty fees or late payment fees from 10% of actual billing (which had been authorized by the Public Service Commission) to 5%, effective January 31, 1973.
Through a conveyance dated September 2, 1966, Hawkins acquired a residence in Greinwich Terrace. A portion of the GSOA statement of account owed by Hawkins records transactions from August 1970. On December 8, 1970, payment of $9.60 was entered on the account. Hawkins has not paid on his account after that date. Suit was filed on June 25, 1973 seeking $337.22 representing the balance due including penalties through April, 1973.
The trial judge found that Hawkins paid some of the bills and that Hawkins is still receiving service from the sewage system. He concluded that the $4.80 monthly rate was lawful since authorized by the Public Service Commission. He further found that the penalty fee was not violative of the Consumer Credit Protection Act, which exempted public utilities.
Hawkins alleges as errors: 1) that he was under no legal obligation to pay for sewage service, since neither a real obligation arose through ownership of the property, no express or implied contract was formed, and no quasi-contractual obligation arose; 2) that the Public Service Commission was not responsible for setting rates; 3) that the full sum ordered by the Commission was not collectible by Grein; 4) that the Court erred in dismissing his reconventional demand for violation of the Consumer Credit Protection Act, 15 U.S. C.A. § 1601 et seq.; and 5) that we should sustian his peremptory exception of no right of action filed in this court challenging the propriety of a partial assignment of a debt and the right of Grein to collect it.
We find four issues to be considered. Was Hawkins under a legal obligation to pay for the sewage services? If so, in what amount? Was plaintiff Grein entitled to collect the full amount of the assessments? Was there a violation of the Consumer Credit Protection Act?
Hawkins is legally bound to pay for sewage services rendered. We pretermit consideration of whether a real obligation or a quasi-contractual obligation arose, finding that Hawkins became contractually obligated to pay.
It is undisputed that Hawkins used the sewage facilities provided by GSOA. He paid at least two months' fees. He purchased the property on September 2, 1966. The statements of account listed in the record show no indebtedness prior to August, 1970. It seems certain that someone paid the monthly sewage assessments between September, 1966 and August, 1970, since no accumulated indebtedness had accrued. The monthly statements reveal the name of the operator, the rates, and the terms of payment.
We find that Hawkins' actions constitute consent to the contract for the performance of services. LSA-C.C. arts. 1811 and 1816 describe how assent to a contract may be shown by actions:
Art. 1811. The proposition as well as the assent to a contract may be express or implied:
Express when evinced by words, either written or spoken;
Implied, when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances *222 be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent.
* * * * * *
Art. 1816. Actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under circumstances that naturally imply a consent to such contract. To receive goods from a merchant without any express promise, and to use them, implies a contract to pay the value. If an offer is made of an article in deposit, and the article is received, the contract of deposit is complete. If a mandate is acted on, the mandatary is bound in the same manner as if he had accepted in writing. In all those cases and others of the like nature, all the conditions, which he, who gives or proposes, annexed to the delivery or the acceptance of the proposition, are also presumed to have been accepted by the act of receiving. If the merchant, in delivering the goods, declare that they must be paid for by a certain time; if the depositor designate how the deposit is to be kept, or the mandator in what manner his commission is to be executed, he who receives and acts is obligated to the performance of all these conditions.
Hawkins paid for at least two months' services. He did so with knowledge of who provided the services, the amount of the rates, and the penalties for late payment. He chose not to continue to pay, alleging that he never specifically agreed to pay for the services. We hold that his consent to the terms and rates of GSOA was manifested both by his continued use of those services and by his initial payment for the services. Having expressed consent through his own action and benefited from the services rendered, he is obligated to pay for those services.
The second issue concerns the amount due. LSA-R.S. 45:1203 provides that the Public Service Commission is authorized to set rates for the type of sewage disposal operation here involved. The Commission ordered a 60% increase in rates for the Greinwich Terrace Sanitary Corporation. The legality of that order is not here questioned.
Hawkins argues that in order for the $4.80 rate to be effective, some further act by the corporation must be taken to adopt that rate. He points to the articles of incorporation which set the rates at $3.00. The articles further provide that rates shall be set by the Board of Directors or by the shareholders. Since there is no evidence of such action, Hawkins contends, it must be presumed that the corporation was unauthorized to collect more than $3.00 monthly per residence. We note that the order granting the rate increase indicates that the corporation itself applied for the rate increase. Nevertheless, no evidence was presented showing that the board or the shareholders authorized a rate increase in accordance with the procedure outlined in the charter.
An analysis of the implications of these circumstances is unnecessary in light of the Louisiana Constitution, Article VI, § 5. Regardless of whether the procedures in the articles were followed, the Constitution provides that rates fixed under lawful authority of the Commission shall go into effect at the time fixed by the commission. These rates SHALL remain in effect and be complied with, unless and until set aside by the Commission, or by a final judgment of a court of competent jurisdiction.
The corporation was placed under control of the Commission in 1960. The Commission's order authorized the corporation to apply the adjusted rates upon receipt and acceptance of those rates. Those rates, including a $4.80 fee for residences along with a 10% late fee, went into effect on November 14, 1968, the date acceptance was received by the Commission. The 10% late fee remained in effect until the 5% late fee went into effect January 31, 1973.
The third issue concerns Grein's right to collect all or part of the accrued assessments. Hawkins' exception of no *223 right of action contends that only a partial assignment was confected. He contends that a debt cannot be divided by the creditor and partially assigned without the debtor's consent, thereby exposing the debtor to multiple actions. He cites Pelican Supply Co. v. Shreveport Plumbing Co., 128 So.2d 924 (La.App. 2 Cir. 1961).
The substance of Hawkins' complaint stems from the terms of the contracts under which Grein claims his right to proceed. The articles of incorporation set the rates at $3.00. The Corporation entered an operating agreement with Southern Construction whereby Southern agreed to operate the system in return for the right to collect the monthly assessments of $3.00. Southern later assigned this operating contract to Grein.
Hawkins alleges that the rate increase ordered by the Commission was only for the benefit of the corporation, and could not be claimed by Grein without an assignment. The result, alleges Hawkins, is that he became a debtor of the corporation for the amount of the rate increase while the monthly obligation to Grein remained at the $3.00 rate.
Hawkins' argument might be persuasive if there was in fact a partial assignment of the indebtedness to Grein. Although the operating contract between the corporation and Southern speaks of an assignment of the right to collect monthly fees in the amount of $3.00 for residences, this was nevertheless a full assignment of the total fee chargeable at the time of the transaction. The corporation could collect no more than $3.00 monthly. It assigned the full extent of its rights to Southern. The corporation retained no responsibility in regard to maintenance and reserved to itself nothing in regard to assessments. No mention was made of the reservation to the corporation of an interest, whether or not a rate increase would occur.
We reject the contention that a partial assignment occurred. Although the operating contract between the corporation and Southern mentioned a $3.00 rate, the intent of the parties at that time was to assign all the corporation's operating rights and obligations. Southern assumed total performance of the operating obligations; it further assumed total operating benefits. By its terms, the assignment by Southern to Grein was likewise total. When the Commission ordered the increase, it inured to the benefit of Grein by virtue of the operating contract and the assignment. It is Grein who is burdened with the total operating costs under the assignment. Just as he must suffer the penalty of increased costs, so may he receive the benefit of increased rates, duly authorized by the Commission.
The final issue concerns Hawkins' reconventional demand under the terms of the Consumer Credit Protection Act, 15 U.S.C.A. § 1601 et seq. This statute exempts:
§ 1603(4) Transactions under public utility tariffs, if the Board determines that a State regulatory body regulates the charges for the public utility services involved, the charges for delayed payment, and any discount allowed for early payment.
The term "Board" in the act refers to the Board of Governors of the Federal Reserve System. Hawkins argues that since no evidence was introduced that the Board had determined that a state regulatory body regulates the charges, the terms of the exemption are not met.
Hawkins relies entirely upon the point that no positive action has been taken by the Board. He does not attempt to show that, if the Board were to have before it the question of whether or not a state regulatory body were regulating the rates and delayed payment charges for GSOA, it would rule in the negative.
We do not find the intent of Congress was as restrictive as Hawkins urges. To hold that GSOA is not regulated by a state regulatory body because the Board has not *224 yet so determined would be contrary to the law and facts before us. Furthermore, we do not wish to express an outright negative determination before the Board has had an opportunity to authortatively rule.
We find it inconceivable that the Board, if given the facts contained in this record, could fail to find that a state regulatory body regulates the charges made by GSOA. Both GSOA and the corporation are regulated through operation of the Louisiana Public Service Commission by virtue of LSA-Const. art. VI § 5 and LSA-R.S. 45:1203. These factors alone establish a prima facie showing that a state regulatory body regulates the charges and delayed payment charges for public utility services. It being apparent that GSOA comes within the meaning of the exception, 15 U.S.C.A. § 1601 et seq., the Consumer Credit Protection Act is not here applicable.
The trial court judgment is affirmed at appellant's costs.
Affirmed.