448 So.2d 699 (1984)
Mr. and Mrs. Mervin LeBLANC, et al.
v.
CITY OF PLAQUEMINE, et al.
No. 83 CA 0564.
Court of Appeal of Louisiana, First Circuit.
February 28, 1984.
Rehearing Denied April 10, 1984.
*700 John Schwab and Leu Ann Lester Greco, Baton Rouge, for plaintiffs, Mr. and Mrs. Mervin LeBlanc, et al.
Wallace F. Brand and David A. Leckie, Brand & Leckie, Washington, D.C., and William C. Dupont, Dupont, Dupont & Dupont, Plaquemine, for defendants, City of Plaquemine.
Before SHORTESS, LANIER and CRAIN, JJ.
CRAIN, Judge.
This is an appeal from a judgment of the trial court in a suit for declaratory judgment holding that the plaintiffs have the right to terminate electric service from the defendant, the City of Plaquemine (City), in order to obtain the same service from Gulf States Utilities (GSU).

FACTS
Green Acres subdivision is located in Iberville Parish, outside of the corporate limits of the City. It consists of two separate *701 developments, Green Acres I and Green Acres II. The subdivision was developed by Allied Investments (Allied), a partnership that was later incorporated.
The City operates a public utility and furnishes electric services both within and without its corporate limits. During the initial stages of development of Green Acres I, in the late 1960's or early 1970's, Allied requested the City to extend its electric facilities to the subdivision. Mr. J. Gerald Dupont, a partner in Allied, testified that Allied actually preferred service by GSU, but the arrangement with the City was agreed upon because the City would not furnish water unless it could also furnish electric service.[1] There was no written document containing this agreement between Allied and the City. The City installed its poles and lines down the length of the principal street of the subdivision.
After Green Acres I was completed, lots were sold. Some of the purchasers requested electric service from the City while a few chose service from GSU, which has electric facilities to the rear of some of the lots.[2]
Green Acres II was developed in the mid-1970's in much the same way as Green Acres I, except that Allied entered into a "utilities service agreement" with the City whereby the home-owners would be allowed to tie into the city sewerage system if Allied would include an additional restrictive covenant in their subdivision restrictions, providing that the City would be the sole supplier of electric service in Green Acres II. That agreement was filed with the Iberville Parish Recorder on August 3, 1977; however, there was no evidence that this additional restriction was ever actually added to the existing restrictive covenants.[3]
The plaintiffs in this suit are approximately 50 customers all residing in Green Acres subdivision and all presently receiving electric service from the City. Each plaintiff had verbally requested from the City initial service or transfer of service (from a prior location) to their home in Green Acres subdivision. This request was accompanied by a utility deposit or their previous deposits were transferred to their new account in Green Acres. Plaintiffs have since requested service from GSU, but GSU has declined pending the plaintiffs' release from the City's electric services. At the time suit was filed, GSU's rates were considerably lower than the City's.

TRIAL COURT
Plaintiffs filed suit on October 10, 1980, seeking a declaration of an alleged right to terminate the City's electric service in favor of service by GSU and an injunction prohibiting the City from continuing to serve them. The petition alleges that the City's service "is illegal, ultra vires and in excess of the corporate municipal authority of the City of Plaquemine, in that there is no service agreement therefor between any of plaintiffs and the City of Plaquemine, as required by La.R.S. 33:1326." In its answer, the City denied the allegations of the petition and averred the existence of service agreements sufficient for the purposes of La.R.S. 33:1326. The City pleaded affirmatively the existence of custom and usage bearing on the terms of electric service agreements and made a reconventional demand for compensation for electric facilities that were installed in order to service plaintiffs in the event plaintiffs prevailed.
*702 By off-the-record stipulation before trial, plaintiffs agreed not to advance their claim for injunctive relief.
After trial on the merits, the trial judge held that the City did not have any service agreements as contemplated by La.R.S. 33:1326, and plaintiffs have the right to terminate electric service from the City in order to obtain service from GSU. The court also found that since the City failed to charge plaintiffs for service extensions when service was first provided, the City is not entitled to compensation from the plaintiffs for electric facilities or extension of service should plaintiffs elect to terminate service with the City. From that judgment, the City appeals, citing eight assignments of error.

ASSIGNMENTS OF ERROR
Appellant argues in its first assignment of error that the court erred in concluding that no "service agreements" of the kind required by La.R.S. 33:1326 exist between the plaintiffs and the City. We agree.
La.R.S. 33:1326 provides:
Any parish or municipality operating a gas, water, or electric light or power system, sewerage plant, or transportation system, may extend such services to persons and business organizations located outside its territorial bounds, or to any other parish or municipality. Such extension shall be in accordance with the terms of service agreements entered into by the parish or municipality supplying the service and the persons, business organizations, parishes, or muncipalities receiving the service. (Our Emphasis)
As the trial judge pointed out, there are no prior decisions interpreting this statute to guide us as to what constitutes a "service agreement". However, La.R.S. 33:1323 does provide that the Local Services Law, of which La.R.S. 33:1326 is a part, "shall be construed liberally, to the end that, through the use of arrangements provided herein, greater economy and efficiency in the operation of local services may be encouraged, and the benefits of such services may be extended."
The trial court found that La.R.S. 33:1326 must be interpreted to mean that a "service agreement" is more than a request for utility service and a deposit to ensure payment of the bill. Although the trial judge found that La.R.S. 33:1326 did not require a written agreement, he suggested that the City could have set up a written service agreement with each person stating the duration of service, cost of installation, price of electricity, termination charges, etc. Because the City did not have such an agreement with its customers, the trial judge found that the City had no La.R.S. 33:1326 "service agreements" with plaintiffs.
On appeal, the City argues that a reading of the Local Services Law (La.R.S. 33:1321 et seq.) demonstrates that the term "service agreements" cannot reasonably be construed to mean more than a contract valid under Louisiana's law of obligations. The City then submits that the arrangements under which it furnishes electric service to the plaintiffs constitute valid binding contracts and therefore, sufficient "service agreements" for the purposes of La. R.S. 33:1326. The City's expert witness, Mr. Sylvan J. Richard, general manager of the Louisiana Energy and Power Authority, who is in close contact with municipal utilities, testified that he did not know of a single municipal utility that reduces its service agreements with customers to writing.

THE EXISTENCE OF LA.R.S. 33:1326 SERVICE AGREEMENTS
After review of the Local Services Law we are persuaded that the appellant's interpretation of the meaning of "service agreements" in La.R.S. 33:1326 is the correct one. It is obvious that had the legislature intended a stricter construction of La. R.S. 33:1326, it would have specified what additional formalities were necessary. In two other provisions in the same act, additional formalities are specified for different agreements. La.R.S. 33:1325 requires that La.R.S. 33:1324 agreements between political subdivisions be reduced to writing, and La.R.S. 33:1331 requires that they include a *703 statement of the financial obligations of each of the parties to the agreement. Therefore, in view of La.R.S. 33:1323's policy of liberal construction, we conclude that the term "service agreements" in La.R.S. 33:1326 in no event requires any more than the basic requirements of a contract under Louisiana law.
La.C.C. art. 1779 states the four requisites of a valid contract: (1) competent parties, (2) their consent, (3) a certain object, and (4) a lawful purpose. We find each of these elements met in this case, forming a valid contract or "service agreement" between the City and its customers. In Grein v. Hawkins, 295 So.2d 219 (La. App. 3rd Cir.1974) the court held that use of sewerage utility services, billings and payment of bills evidenced a binding contract in that case. In City of Houma v. Terrebonne Parish Police Jury, 345 So.2d 1206 (La.App. 1st Cir.1977), the court stated that the "service agreements" provided for in La.R.S. 33:1326 are "accords reached by the entity supplying the utility and the receiver of the utility service." We see no reason why the request for utility service, combined with service, billing and paymentcertainly an accord reached between the City and plaintiffsshould not be termed a contract or "service agreement" in the case before us. Indeed, the appellees do not dispute that there is a contract present but argue that this alone is not sufficient absent more specific terms. We disagree.

TERM OF THE SERVICE AGREEMENTS
Appellees argue that the service agreements by which they receive electricity from the City do not comply with La.R.S. 33:1326 because there is no agreement as to duration of term. The implication of this argument is if a service agreement exists it can be terminated unilaterally by the customer in favor of another supplier. The appellant in its second assignment of error argues that these agreements are not unilaterally terminable by the plaintiffs for purposes of obtaining electricity from another source either during the period of the requirements of the customers receiving the service, or for the depreciable life of the facilities employed to furnish the electric service. Since the trial court found that no service agreements exist, its opinion contains no findings as to the termination or duration of these agreements.
The term of the service agreements involved in this case was not stipulated in the agreements. In the absence of an express stipulation as to the term of a contract, Louisiana courts will infer a reasonable term from the nature of the contract and the circumstances of the case. La.C.C. art. 2050; Equitable Petroleum Corporation v. Central Transmission, Inc., 431 So.2d 1084 (La.App. 2d Cir.1983); Parquette v. Arceneaux Music Center, Inc., 425 So.2d 362 (La.App. 3rd Cir.1982). Among those circumstances are the manner of the parties' execution of their obligations, and pertinent usage and custom. La. C.C. arts. 1953, 1956 and 1966; See Wolfe v. Sample, 141 So. 812 (Orl.La.App.1932).
The parties in this case agreed that the testimony of six of the plaintiffs would be deemed representative of that which would have been elicited from the remaining plaintiffs, had they been called. Each of these plaintiffs testified as to their different subjective intentions regarding the City's extension of electric service. Two testified that they did not have any particular intention as to the duration of the service at the time they requested it. Two testified that they, unknown to the City, intended to switch to GSU eventually. One testified that he intended that his service could be terminated at any time.[4] None of these intentions were communicated to the City at the time service was requested. Most significant was the fact that not one of the plaintiffs could claim knowledge of (nor was there cited) a single case of a *704 City's customer switching to another utility without the express consent of the City. On the other hand, it is obvious that based upon its substantial investment in electric facilities, for both generating and distributing electricity, the City's understanding was that these service agreements were not terminable at the customer's will for the purpose of obtaining the same service from another utility.
The following provisions of the Civil Code allow for the employment of custom and usage in defining the terms of the agreements in this case:
La.C.C. art. 1903. The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect.
. . . . .
La.C.C. art. 1953. Whatever is ambiguous is determined according to the usage of the country where the contract is made.
. . . . .
La.C.C. art. 1964. Equity, usage and law supply such incidents only as the parties may reasonably be supposed to have been silent upon from a knowledge that they would be supplied from one of these sources.
Also, La.C.C. art. 1966 states, in pertinent part: "By the word usage mentioned in the preceding articles, is meant that which is generally practiced in affairs of the same nature with that which forms the subject of the contract."
The testimony at trial established what were the customary practices between utilities and their customers. Mr. Richard testified that in his 25 years in the utility business in Louisiana he had not known or heard of a single instance in which a customer to whom one Louisiana utility had extended service was permitted unilaterally to terminate that service in favor of another supplier.
Also significant is the fact that GSU refused to serve the plaintiffs until they obtained releases from the City. The only recorded transfer of a customer from the City's service to another service was that of Plaquemine High School and a few nearby customers to service by Louisiana Power and Light (LP & L). This was part of a settlement reached by City and LP & L in an antitrust suit, in which the City agreed (in a letter drafted by LP & L) to refrain from making any claim against LP & L "for inducement of breach of contract or otherwise". The trial court ruled the letter inadmissible as hearsay; however, the record reflects that the letter was signed by the mayor of the City of Plaquemine who testified at trial. We find the letter tends to prove, along with GSU's conduct, that these utilities recognize the possibility of contractual difficulty resulting from City customers attempting to unilaterally change utility companies.
Finally, we note that the plaintiffs residing in Green Acres II were sufficiently put on notice by the document entered into by Allied and the City that the City would be the sole supplier of utility services to that subdivision. The document was filed in the office of the parish recorder and under the provisions of La.R.S. 9:2721 this constituted notice to the buyers who subsequently requested City service, that nonterminability was arguably a condition of that extension.
Based on the above examination of custom and usage in the utility business, and the nature of these service contracts, we find that these service agreements with the City are not terminable at will by the plaintiffs for a reasonable term and reverse the judgment of the trial court.
We do not find it necessary at this time to fix the actual duration of the reasonable term of these service agreements for these plaintiffs since plaintiffs did not request such a determination in their petition. We decide only that there are valid service agreements that cannot be unilaterally terminated for a reasonable *705 term for the sole purpose of obtaining electricity from another supplier.[5] Of course, the City is bound to provide these plaintiffs the same right of termination it provides its other customers.[6]
For the foregoing reasons, we reverse the judgment of the trial court, and assign all costs of this appeal to the plaintiffs. We do not reach appellant's remaining assignments of error, which are concerned with compensation in the event of termination.
REVERSED AND RENDERED.
NOTES
[1] Testimony indicated that at the time this agreement was made the City's utility subsidized its water and sewerage services.
[2] The dispute in this case would ordinarily not occur since La.R.S. 45:123 prohibits one electric public utility from constructing facilities or offering to furnish electric service to any point which at the time is located within 300 feet of an electric line of another electric public utility. However, this statute specifically excludes from its application "municipally-owned or operated utilities of the State of Louisiana".
[3] Because of our holding in this case it is not necessary for us to determine whether the service agreement with the developers of Green Acres II acted as a restrictive covenant on purchasers of lots in that development. The plaintiffs who live in Green Acres II are actually receiving electricity from the City.
[4] The remaining plaintiff who testified was not questioned as to his intent as to duration when he requested service.
[5] The determination of what is the "reasonable term" of these service agreements should be reached by taking into consideration such matters as the amount of time necessary for the City to recover its investment, the prevailing practice with similar contracts for furnishing electrical service to customers and any other matters which might be relevant to determine the length of a customer service contract to enable the utility to furnish such service at the least possible cost.
[6] This would include the right to terminate electrical use in the event the particular plaintiff no longer requires electrical service at the address where it is being supplied. However, no other customer is given the right to terminate in favor of another supplier.